IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 10, 2009 Session

# LARRY MCKAY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-4079     Chris Craft, Judge**

---

**No. W2008-02274-CCA-R3-PD  - Filed June 15, 2010**

---

In 1981 a Shelby County jury convicted the Petitioner, Larry McKay, and his co-defendant, Michael Sample, of two counts of felony murder and imposed upon both men a sentence of death.  On direct appeal, the Petitioner's convictions and sentence were affirmed.  *State v. McKay*, 680 S.W.2d 447 (Tenn. 1984), *cert. denied*, 470 U.S. 1034 (1985).  The Petitioner filed multiple post-conviction petitions, one of which was filed in 1995 and is the subject of this appeal.  In that petition, the Petitioner contended that the prosecution violated his right to due process and a fair trial by suppressing exculpatory evidence against him.  The post-conviction court dismissed the petition, and, after a thorough review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Gerald Skahan, Memphis, Tennessee, Patrick Frogge, Nashville, Tennessee, for the Appellant, Larry McKay.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I.  Facts**
**A. Direct Appeal**

This case arises from the 1981 murders of Benjamin Cooke and Steve Jones, which occurred at the L&G Sundry Store in Memphis, Tennessee. The facts underlying the Petitioner's conviction were set forth in our Supreme Court's opinion affirming the Petitioner's conviction and sentence on direct appeal:

On August 29, 1981, at approximately 11:00 p.m. Melvin Wallace, Jr., went into the L&G Sundry Store at 1069 North Watkins in Memphis to purchase two barbecue sandwiches. When he entered, there were four men in the Sundry Store, including two clerks, Benjamin Cooke and Steve Jones, who were known to Wallace as he was a regular customer. The other two black men were the defendants, Larry McKay and Michael Eugene Sample. Wallace did not know them but positively identified them in a line-up at 2:43 p.m. on August 31, 1981, as the murderers of Cooke and Jones and Sample as the person who shot him in the thigh and back and attempted to shoot him in the head.

Wallace testified that he went to the back of the store where Cooke had gone to prepare the sandwiches. McKay was also standing in the back with a quart of 45 Beer mumbling to himself. Not wanting to get involved with a drunk, Wallace turned and directed his attention to the front of the store where Jones and defendant Sample were standing. When he thought the sandwiches would be ready, he looked around at Cooke and saw that McKay had gone behind the counter and was holding a gun at Cooke's head. When Wallace realized "it was a robbery" and "broke and ran for the front door," Sample hollered for him to halt and shot him in the thigh. Wallace tried to play dead but Sample came over and said, "This nigger ain't dead," and shot him in the back. Wallace had heard Sample demanding that Jones give him all the money and heard Jones say, "Man, I gave you everything I had." After hearing Sample say several times, "I ought to kill all you son-of-a-bitches," Wallace heard him say, "Kill every son-of-a-bitch in here," and the defendants started shooting. Wallace testified he saw McKay shoot Cooke in the head. Sample came back to where Wallace was lying on the floor and put a pistol to his head. It clicked several times and did not go off. Wallace testified that he "came up off the floor" and started wrestling with Sample. The gun went off past Wallace's head and he lapsed into unconsciousness. When Wallace woke up, he heard Sample say, "Let's get the hell out of here."

Cooke and Jones died from the bullet wounds to their heads; but when the police arrived shortly after the killers left, Wallace was able to give them

2

information about the episode and gave a description of the killers while he was receiving medical care at the scene and at the hospital. One of the investigating officers remembered that [the Lillie & Eddie Grocery Store] across the street from the L&G Sundry Store had been robbed about ten days earlier, and that the witnesses had said the robbers were two black males wearing blue-green surgical caps. Among the items taken in that robbery was a .45 caliber automatic pistol that had a tendency to misfire. Shell casings from a .45 caliber automatic were found in the Sundry Store; and putting together leads from the two robberies, the police apprehended Sample and McKay the next day. They were in a car with a third man, and the .45 automatic with the serial number of the pistol stolen from the grocery across the street was found on McKay. A .32 caliber revolver was found inside the car. Bullets recovered from Jones' cheek, Cooke's head and chest and Wallace's leg had been fired from the .32 caliber revolver found in the car. Two blue hospital surgical caps were found in the car. More than two hundred and perhaps as much as seven hundred dollars in cash was stolen from the Sundry Store; and McKay, who was unemployed, had $166.30 on his person when arrested. Sample had $195 in cash at that time. The third man in the vehicle testified to incriminating circumstances linking defendants to recent criminal activity.

Charles Rice, age sixteen, went to the L&G Sundry Store to buy cigarettes and as he arrived at the door he saw the robbery in progress, specifically the gun pointed at the head of one of the clerks. He turned and ran home and told his mother what he had seen and later reported the information to the police. He made a positive identification of both defendants.

*State v. McKay and Sample*, 680 S.W.2d 447, 448-49 (Tenn. 1984). Both Sample and McKay were convicted of two counts of felony murder. At a sentencing hearing to determine punishment, the jury sentenced McKay to death based on three aggravating circumstances: that he created a great risk of death to two or more persons other than the victims who were murdered; that he committed the murder to avoid, interfere with or prevent a lawful arrest or prosecution; and that the murders were committed in the course of committing a felony. *Id*. (citing T.C.A. § 39-2404(i)(3), (6), (7) (Supp. 1981)).

## B. Post-Conviction Proceedings
### 1. Procedural History

After the Petitioner's convictions and sentences were affirmed on direct appeal, he filed numerous petitions for post-conviction relief; all were denied. *See, e.g., McKay &*

3

*Sample v. State*, No. 25, 1989 WL 17507 (Tenn. Crim. App., at Jackson, March 1, 1989), *perm. app. denied* (Tenn. July 3, 1989); *Sample & McKay v. State*, No. 02C01-9104-CR-00062, 1995 WL 66563 (Tenn. Crim. App., at Jackson, Feb. 15, 1995), *perm. app. denied* (Tenn. Jan. 27, 1997); *State v. McKay & Sample*, No. 02C01-9506-CR-00175, 1996 WL 417664 (Tenn. Crim. App., at Jackson, July 26, 1996), *perm. app. denied* (Tenn. 1996). In 1992, the Court of Appeals released a decision holding that the Tennessee Public Records Act applied to criminal cases under collateral review, and, pursuant to this opinion, the Petitioner requested a copy of the State's file from his trial. *Capital Case Resource Center v. Woodall*, No. 01-A-019104CH00150, 1992 WL 12217 (Tenn. Ct. App., at Nashville, Jan. 29, 1992), *superseded by statute as stated in*, *Waller v. Bryan*, 16 S.W.3d 770 (Tenn. Ct. App. 1999), *perm. to appeal denied* (Tenn. 2000). In September 1993, the Petitioner received a copy of the file, and, based on the documents contained therein, he filed another petition for post-conviction relief in 1995 that is the subject of this appeal.

In the 1995 petition, the Petitioner complained that the prosecution violated his rights to due process and a fair trial under the Fourteenth Amendment to the United States Constitution and article I, section 8, of the Tennessee Constitution by suppressing exculpatory evidence. *Sample*, 82 S.W.3d 267, 269-70 (citing *Brady v. Maryland*, 373 U.S. 83 (1963); *Johnson v. State*, 38 S.W.3d 52 (Tenn. 2001)). Relevant to this appeal, the petition alleged the State failed to turn over to him seven specific pieces of evidence:

1. A document titled "Supplementary Offense Report" dated August 30, 1981 in which officer J.D. Welch summarized his conversation with Melvin Wallace, the surviving victim of the L&G Sundry store robbery/murders.

2. Various witness statements from witnesses to the Lillie & Eddie Grocery Store robbery (which, as discussed below, occurred shortly before the robbery/murders at the L&G Sundry store) describing the robbers as wearing "hospital scrub caps" when other witnesses reported the robbers as wearing "shower cap[s]."

3. A document titled "Supplementary Offense Report" dated August 30, 1981, in which Officer Malone related a conversation with Eddie Wright, the owner and victim of the robbery at Lillie & Eddie's grocery store, during which Wright said a friend had identified Sammy House as a person involved in the robbery.

4. A document titled "Memphis Police Department Supplementary Offense Report" dated August 30, 1981, in which Officer Malone relayed his suspicions that Grover Jones, one of the victim's uncle, was the owner of the

4

L&G grocery store and may have been involved in drug dealing and may have been withholding information from police.

5. A document titled "Supplementary Offense Report" dated September 1, 1981, in which Charles Rice, a State's witness, told police he had not been at the robbery/murder scene.

6. A statement from Willie Everett provided on August 30, 1981, in which Everett provided a description of the robbers of the Lillie & Eddie Grocery Store.

7. A latent fingerprint report from the grocery store dated August 31, 1981, that identified a fingerprint not belonging to the Petitioner.

The lower court dismissed the petition without a hearing as being barred by the statute of limitations. *Id.* A panel of this Court reversed the lower court's dismissal and remanded for a determination of whether the petition should be evaluated as a later arising claim. *Id.* On remand, the lower court again found that the petition had been filed outside the statute of limitations. *Id.* This Court affirmed the lower court's dismissal. *Id.* The Tennessee Supreme Court held that due process required that, even though the three-year statute of limitations had expired, the Petitioner may present his claim that the State had withheld exculpatory evidence, and the Court reversed and remanded the case to the post-conviction court for further proceedings. *Id.* at 279.

## 2. Proof at Post-Conviction Hearing

On remand, the post-conviction court noted that he had inherited the cases of Petitioners McKay and Sample from a then retired judge and ordered the proceedings for the two Petitioners be separated, and neither party objected. Evidence was then heard on both petitions, and the following evidence was presented on behalf of Petitioner McKay: Robert Jones, the Shelby County Public Defender, testified that he and his co-counsel, Edward Thompson, represented Petitioner McKay during his 1982 trial. Mr. Jones had his file from his representation of Petitioner McKay and identified from his file numerous exhibits, beginning with Exhibit 7, which included a motion for production of exculpatory evidence he filed on behalf of Petitioner McKay, an order granting the motion for disclosure of impeaching information, and an order denying the motion for witness statements prior to trial.

Jones also identified a redacted statement that began "Lillie & Eddie's Grocery, which occurred on August the 18th, 1981." Jones stated that this document was contained in his

5

discovery file and would have been provided pre-trial. Jones also identified a document labeled "arrest report by J.D. Douglas." Jones said he and the Petitioner's post-conviction counsel searched Jones' file and could not find this document. He assumed, therefore, he had never seen it before.

Jones also identified Exhibit 8 as a supplementary offense report dated August 30, 1981. Jones testified that this document was contained in his file, specifically in a section he had reserved for *Jencks* materials. Jones explained that, normally, *Jencks* material is provided by the State to the Defendant immediately after a witness testified on direct examination and before a defendant's attorney cross-examined the witness. Jones's file indicated that the State provided him this information at trial during officer J.D. Douglas's testimony. Also contained in the *Jencks* file was a statement from State's witness Melvin Wallace, which Jones identified as Exhibit 9. Exhibit 9a was a redacted statement from Wallace, starting with "Melvin, on Monday on August 31st at 2:43 p.m.," that Jones conceded could have been provided to him pretrial rather than during the trial. Jones identified Exhibit 9b as a supplementary offense report dated December 7, 1981. Jones indicated that this report was not included in his file.

Jones identified Exhibit 10 as a supplementary offense report dated August 18, 1981, that he did not have a copy of in his file. Jones said the victim on that report was listed as Lillie & Eddie's grocery store. Jones testified that the officer who created this document did not testify at trial.

Jones next identified Exhibit 11 as a supplementary offense report dated August 30, 1981, an exact copy of which was not contained in his file. Jones testified that there were two copies of this document, drafted by two different officers, and his file contained the version drafted by the other officer. Jones explained that only one of the two officers testified at trial, and he received the report from the testifying officer as it was subject to the *Jencks*.

Jones testified about Exhibit 12, identifying it as a statement of State's witness Charles Rice, who identified Petitioner McKay at trial as one of the robbers in this case. Jones said he had Rice's statement in his file in a folder labeled "Charles Rice." Jones explained that this folder contained all the statements from Rice, including the statements produced by the State during discovery, statements gathered as part of the defense team's investigation, and statements produced by the State pursuant to the *Jencks* Act. While unsure, Jones presumed Exhibit 12 was produced as part of discovery. Jones next identified Exhibit 12a as a redacted statement of Rice that the State produced to him pursuant to the *Jencks* Act and that was contained in Jones's file.

Jones identified Exhibit 13 as a supplementary offense report dated September 1, 1981, signed by Sergeant D.W. Robertson. Jones testified that he could not locate a copy of this document in his file. Jones said Sergeant Robertson did not testify at trial.

Jones identified Exhibit 14 as a copy of a latent fingerprint. The heading of the document stated "To latent fingerprint squad from L.W. Hunt, violent crimes, date August 31, 1981." The victim on the document is listed as "Lillie's Grocery." Jones further explained that his file did not contain a copy of this document.

Finally, Jones identified Exhibit 15 as a statement by Willie Everett, a witness to the Lillie & Eddie Grocery Store robbery, that he did not have a copy of in his file.

In further testimony, Jones testified that, at the time, it was not general practice for the defense to get a police report created by an officer that did not testify at trial. Further, the State usually produced the reports that the defense received after direct examination and before cross-examination. Similarly, the defense usually received a witness's statement after the witness had testified on direct examination. Therefore, if a witness did not testify, the defense did not necessarily get that witness's statement.

On cross-examination, the State's attorney asked Jones if the State gave him a list of witnesses as part of the discovery materials. Jones responded that he and co-counsel met with Assistant District Attorney General Tom Henderson multiple times, and General Henderson provided them with discovery and many of the witnesses names and addresses. Further, he had the indictment, which listed many of the witnesses and the lineup identification form, which provided the names and addresses of several witnesses. Jones assigned an investigator, Ralph Nally, to talk with the witnesses whose names had been provided. The defense team also obtained some witness statements from transcribing the "witness hearings" and/or motion hearings. From the "witness hearings," the defense team got statements from: Willie Everett, Eddie Wright, Charles Edward Rice, Officer D.W. Robertson, Officer Randy Oliver, Melvin Wallace, Officer A.J. Walton. The investigator interviewed: Charles Malone, Joe Howard, Geno White, Percy Jeffries, Willie Everett, Charles Rice, Eddie Wright, Billy Smith, Johnny Smith, Mike Winfrey, and L.C. Doss. Jones later testified that the defense team was also aware that the following people might testify at the Petitioner's trial: Margaret Cook, Mike Wright, Grover Jones, Emma Wilburn, Acie Horton, Louis Henry Rogers, and Franklin Wright.

Jones testified that the defense team obtained the name of Willie Everett from the indictment. Jones's file contained two statements transcribed from Willie Everett, one on August 19, 1982, and the other on January 7, 1982. In the August 1982 statement, Willie Everett described the robbery for Investigator Nally and mentioned that he saw two cars pull

7

into the parking lot during the robbery: a 1965 gold, four-door Chevrolet and a 1974 maroon four-door "duce and a quarter." Everett told Nally that the individuals in the car possessed shotguns. Jones confirmed he had Everett's statement to Nally prior to trial.

Jones testified his file contained a transcription of Melvin Wallace's testimony from a motion hearing. Jones said that, as of February 25, 1982, Investigator Nally had made seven trips to Wallace's house to interview him, but Wallace had refused to give them a statement.

Jones directed Investigator Nally to interview Delores Rice, who was Charles Rice's mother. Delores Rice told Investigator Nally that she knew nothing about the case but that she thought her son had seen what happened. Charles Rice denied knowing anything about the case and refused to give Investigator Nally a statement.

Jones said that, on September 13, 1982, Investigator Nally interviewed Lewis Rogers in the county jail and Emmett Wallace, who was Melvin Wallace's brother.

Jones testified that his file contained a transcript from an interview Investigator Nally conducted with Eddie Wright on January 7, 1982, and March 24, 1982. Also in the file was a transcript of Wright's testimony at the motion hearing on March 8, 1982.

Jones said his file also contained two statements from Officer Wheeler, one from August 30, 1982, and one from August 31, 1982. His file also contained a third statement from the police. Jones testified these documents were in a file he created before trial, so he surmised he received these statements after the testimony in the suppression hearing. He conceded that he may have received these statements through discovery.

Based upon this evidence, the post-conviction court dismissed the Petitioner's petition. The specific rulings of the post-conviction court will be discussed in each relevant section below.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because he proved that the State improperly suppressed multiple pieces of material evidence, as will be discussed below.

### A. Statute of Limitations

The Petitioner filed his petition outside the relevant statute of limitations, however,

we conclude this Court may still review his claim because due process prohibits strict application of the statute of limitations in this post-conviction case. At the time the petitioner filed this petition for post-conviction relief, the Post Conviction Procedure Act stated:

> [a] prisoner in custody under sentence of a court of this state must petition for post-conviction relief under this chapter within three (3) years of the date of the final action of the highest state appellate court to which an appeal is taken or consideration of such petition shall be barred.

T.C.A. § 40-30-102 (1990). The parties agree that the three-year statute of limitations began to run on July 1, 1986, and that the present petition, filed in January of 1995, was filed well after the limitations period expired. Due process may prohibit strict application of the statute of limitations in a post-conviction case "when the grounds for relief, whether legal or factual, arise after . . . the point at which the limitations period would normally have begun to run." *Sample v. State*, 82 S.W.3d 267, 272 (Tenn. 2002) (citing *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995)). In such a case, the court must determine whether application of the limitations period would deny the petitioner a reasonable opportunity to present the claim by balancing the "liberty interest in 'collaterally attacking constitutional violations occurring during the conviction process,' . . . against the State's interest in preventing the litigation of 'stale and fraudulent claims.'" *Id.* (citations omitted). It is upon this basis that we review the Petitioner's claims.

## B. Post-Conviction Claims

To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgement of a constitutional right. *See Cauthern v. State*, 145 S.W.3d 571, 597 (Tenn. 2004) (citing T.C.A. § 40-30-103). Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003); *State v. Nichols*, 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. *Nichols*, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Id.* (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). It is, therefore, the burden of the petitioner to show that the evidence preponderated against those findings. *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). However, a post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

9

In the case under submission, the Petitioner's claims stem from allegations that the State wrongfully suppressed evidence. In *Brady v. Maryland*, the United States Supreme Court held, "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The State does not have an obligation to disclose information that is not in the possession or control of the State. *Id.* (citing *Banks v. State*, 556 S.W.2d 88, 90 (1977)). A defendant must prove the following four prerequisites in order to establish a violation of due process under Brady:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant must prove these due process violation prerequisites by a preponderance of the evidence. *Id.* (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as:

evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Johnson*, 38 S.W.3d at 56-57 (quoting *Commonwealth v. Ellison*, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). The State has an obligation to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police." *Johnson*, 38 S.W.3d at 56 (quoting *Strickler v. Green*, 527 U.S. 263 (1999)). Additionally, "The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial." *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004)

(citing *Johnson*, 38 S.W.3d at 56).

The Tennessee Supreme Court defined "material" within the context of Brady:

Evidence is deemed to be material when "*there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.*" [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."

*Johnson*, 38 S.W.3d at 58 (citations omitted) (emphasis added)*; see Cauthern*, 145 S.W.3d a571, 598-99 (Tenn. Crim. App. 2004) (emphasis added) (citing *United States v. Bagley,* 473 U.S. 667, 682 (1985)).

This Court must analyze the State's delayed disclosure of evidence differently than the State's non-disclosure of evidence. "Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply, unless the delay itself causes prejudice." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (citations omitted); *State v. Joan Elizabeth Hall*, No. 01C01-9710-CC-00503, 1999 WL 34782, at *9 (Tenn. Crim. App., at Nashville, Jan. 28, 1999), *perm. app. denied* (Tenn. July 12, 1999). Where there is a delayed disclosure of evidence, this Court must determine whether the delay kept defense counsel from effectively using this evidence in presenting and preparing the defendant's case. *Caughron*, 855 S.W.2d at 548. "Delayed disclosure results in prejudice to the defendant and may deny the defendant due process when it is 'too late for the defendant to make use of any benefits of the evidence.'" *State v. Sidney M. Ewing*, No. 01C01-9612-CR-00531, 1998 WL 321932, at *8 (Tenn. Crim. App., at Nashville, June 19, 1998), *no Tenn. R. App. P. 11 application filed*. An incomplete response to a *Brady* request might cause the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citation omitted). If the defense fails to request a continuance after receipt of the evidence, fails to call or recall a witness to testify regarding the evidence, or fails to extensively cross-examine a witness regarding the evidence, the *Brady* violation may be cured. *Ewing*, 1998 WL 321932, at *9.

On appeal, this issue presents a mixed question of law and fact. *Cauthern*, 145 S.W.3d at 599. The post-conviction court's findings of fact, such as whether the defendant requested the information or whether the State withheld the information, are reviewed on

11

appeal *de novo* with a presumption that the findings are correct unless the evidence preponderates otherwise. *Id.* The post conviction court's conclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely *de novo* standard with no presumption of correctness. *Id.*

As previously stated, proof that a *Brady* violation has occurred requires four elements, the first two of which are (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not); and (2) that the State suppressed the information. The post-conviction court in this case found: "There is no question that the petitioner has satisfied element #1, as he filed a written motion requesting exculpatory evidence prior to trial, and an order was entered by the trial judge granting that motion." The post-conviction court similarly determined that the Petitioner had satisfied "element #2 . . . as the State did not turn over any of the below-mentioned material complained of prior to trial (although some items were turned over in redacted form at the pre-trial suppression hearing and some after the testimony of the witness as a '*Jencks*' statement, prior to cross-examination of that witness)." The court qualified this finding by noting that the some of the items were turned over in redacted form at the pre-trial suppression hearing and some after the testimony of the witness as *Jencks* statements prior to cross-examination. The post-conviction court concluded that the State had "'suppressed' this information, albeit unintentionally, because the information was stipulated to have been copied from the State's file and so was in the possession of the State prior to trial."

Accordingly, we begin our review with the post-conviction court's conclusions that the evidence was requested and that the State failed to disclose the information. The function for this Court is to determine whether the Petitioner has also proven the other two elements necessary to prove that a *Brady* violation occurred: that the withheld information was favorable to the accused and, if so, whether the information was material. Again, evidence is deemed material if a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed.

### 1. Melvin Wallace

The Petitioner contends that the State committed a *Brady* violation when it failed to disclose to him several pieces of information pertaining to Wallace: (1) a document titled "Supplementary Offense Report, J.D. Welch, August 30, 1981," in which Officer Welch related a summary of his conversation with victim Melvin Wallace; (2) Wallace's statements to Officer Wheeler; (3) the complete report of Sergeant J.D. Douglas to F.D Warner dated November 17, 1981; and (4) a Summary Report from Officers Dawkins and Hester. The Petitioner alleges that Officer Welch's summary and the statements are contrary to the

testimony Melvin Wallace provided at trial.

Melvin Wallace was the surviving victim of the robbery/murders who testified at trial. He testified that he was shot twice, once in the leg and once in the back by Petitioner Sample, and, Sample attempted to shoot Wallace in the head but Sample's gun misfired and then missed once a bullet engaged. Wallace said the robbers then left him for dead. Wallace also testified that he watched Petitioner McKay "pull [victim Cooke] up and shoot him in the head, because I was beginning to run but I didn't know where to go. I looked back to see what was happening, and I watched him, [Petitioner McKay], pull up and shoot him in the head." Two days after the incident, Wallace identified Petitioner McKay in a lineup as Cooke's shooter. The Petitioner asserts that Wallace made statements to police proving that he could not have observed the events in the manner in which he testified; because Wallace said he "heard" gunshots and never said he saw Cooke get shot; Wallace said he was in the back of the store and Cooke was shot in the front of the store; and Wallace misidentified Petitioner McKay as a man involved in this robbery/murder or as Cooke's shooter.

The Petitioner asserts that Wallace's statements to police show that he crawled to the rear of the store after being shot, which is where victim Jones was shot rather than victim Cooke. Further, victim Cooke was killed with a .32 caliber bullet, which contradicted the State's theory at trial that Petitioner McKay was in the back of the store armed with a .45 automatic weapon. The Petitioner contends that, were he in possession of Wallace's statements that indicated that he heard the gunshots, and omitted any reference to seeing the shooting, he could have more effectively cross-examined Wallace.

### a. Officer Welch's Summary Offense Report

The Petitioner contends that Wallace's statement to Officer Welch, as recorded in Welch's Summary Offense Report dated August 31, 1981, differed from Wallace's trial testimony. Primarily, he asserts that Wallace testified at trial that he saw Petitioner McKay shoot Cooke, which, the Petitioner asserts, contradicts his statement to Officer Welch that he heard the gunshots. The Petitioner notes that his defense counsel was not provided Officer Welch's summary until after the direct examination of Officer Welch, which immediately proceeded Wallace's testifying. He contends that defense counsel was left no time to review Welch's report before cross-examining Wallace.

Officer Welch's summary of what Wallace had told him included that:

At this point he broke and ran to the front of the store, the #1 [alleged to be McKay] subject hollered for him to be stopped and that he did not notice a second subject, which was described as #2 [alleged to be Sample] above, at the

13

front of the store. At this time the number 2 did have a gun pointed at the cashier, and as he approached him running to the number two subject did fire one shot, striking him in the right thigh above the knee. The force of the impact knocked him around and to the side, along the aisle which runs off the main aisle near the check-out point. At this point the #1 subject had started walking his man forward, being the clerk from the rear, and that he overheard the #2 subject state "Kill all these son-of-a-bitches." At this time he heard several shots . . . . Wallace stated that he thought he was going to be killed so he had been on his side, playing dead.

When ruling on this document, the post-conviction court concluded that this summary did not contradict Wallace's trial testimony, reasoning:

At no place in the summary does Sgt. Welch relate that Wallace told him he did not see the killing. The subject of whether or not Wallace saw the shooter when he fired the shot was never mentioned by Sgt. Welch. The officer related Wallace's story from the point of view of the crimes against him as a victim, his breaking and running and his being shot twice by the co-defendant while trying to escape.

The post-conviction court determined that the statement by Sergeant Welch was not "material exculpatory and impeaching evidence" which needed to be turned over prior to trial. The court determined that the report was not a prior inconsistent statement and did not render Officer Welch's testimony false or misleading.

After reviewing the document and trial testimony, we agree with the post-conviction court. In order to constitute a *Brady* violation, the information suppressed by the State must have been material. As previously stated, the materiality aspect of a *Brady* claim is governed by the same prejudice standard as an ineffective assistance of counsel claim; that is, a defendant must show that there is a reasonable probability that the result of the proceedings would have been different. We conclude, as did the post-conviction court, that this evidence was not inconsistent with Wallace's trial testimony. In his statement to Officer Welch, he described the events surrounding his being shot. He did not mention seeing Petitioner McKay shoot Cooke, but the summary does not indicate that he said he did not see this shooting. Rather, the summary focuses on Wallace being shot and his subsequent actions. We cannot conclude that there is a reasonable probability that the result of the trial would have been different had the Petitioner had this document, considering the other evidence supporting his conviction, including that a .45 caliber handgun taken in the Lillie & Eddie's robbery was found on Petitioner when he was arrested; police found a .32 caliber revolver inside the car when Petitioner McKay and Petitioner Sample were arrested; bullets recovered

14

from Jones's cheek, Cooke's head and chest, and Wallace's leg were fired from the .32 caliber revolver found in the car; police found two blue hospital surgical caps in the car with Petitioners McKay and Sample; between $200 and $700 was stolen from the Sundry store and police found Petitioner McKay, who was unemployed, in possession of $166.30 when he was arrested; and another witness also identified Petitioner McKay as one of the robbers in this case.

As further support for our holding, we note that the State in fact did disclose this document, even though it did so in a delayed fashion. Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply, unless the delay itself causes prejudice. We must determine whether the delay kept defense counsel from effectively using this evidence in presenting and preparing the defendant's case. The Petitioner's defense counsel was aware that Wallace was a witness to these events, that Wallace gave statements to police, and that he would have the opportunity to cross-examine Wallace. Upon receiving Wallace's specific statement to Officer Welch, defense counsel did not request a continuance, recall Wallace as a witness, or extensively cross-examine Wallace about this statement. Under these circumstances, we conclude that defense counsel's action, or inaction, cured any potential *Brady* violation. *See Ewing*, 1998 WL 321932, at \*9.

### b. Wallace's Statements to Officer Wheeler

The Petitioner contends the State gave him a "severely" redacted version of the Officer Wheeler's Summary Report at a pretrial motion hearing. He asserts he was not given a full summary of this report until after Wallace testified on direct, as *Jencks* material. Officer Wheeler's report indicates Wallace told him:

> I got off work at 11:00. I left about 11:05 and I went straight to L&G Grocery and got a couple of sandwiches. When I entered the store the male black was standing with the cashier and I asked was they selling any barbecue and the kid said yes. He came back where the barbecue were and started making me a couple of sandwiches. About that time there was another black standing [in] the corner with a quart of beer. Then he went over behind the corner and pulled a gun on the guy that was waiting on me. I heard a click and I started running for the front door. When I got halfway to the cashier counter another gunman at the cashier told me to stop, told me he would kill me and then he shot me in the thigh. I spinned around and fell and I laid there as though I was dead. Then I could hear the gunman at the cashier tell him to give him all the money and I heard the cashier say I gave you all I've got. Then I heard a gunman say I ought to kill all you sonofbitches. Then he said kill everyone of

15

these sonofbitches, kill every goddam one of them. Then they started shooting. I could hear shots from the back and the front.

The Petitioner notes that Wallace again failed to mention to Officer Wheeler that he saw Petitioner McKay shoot Cooke.

About this document, we hold that the Petitioner is not entitled to the relief he seeks. As previously stated, in order to establish the materiality aspect of a *Brady* claim the Petitioner must prove there is a reasonable probability that the result of the proceedings would have been different if the State had given him this document earlier. We conclude, as did the post-conviction court, that this evidence was not inconsistent with Wallace's trial testimony. In his statement to Officer Wheeler, he described the events surrounding his being shot. He did not mention seeing Petitioner McKay shoot Cooke, but the summary does not indicate that he said he did not see this shooting. Rather, the summary focuses on the shooting of Wallcae and his response to being shot. We cannot conclude that there is a reasonable probability that the result of the trial would have been different had the Petitioner had this document in that there was other evidence presented at trial proving Petitioner McKay shot and killed Cooke.

As further support for our holding, we note that the State in fact did disclose this document, even though it did so in a delayed fashion. Pursuant to *Jencks*, the State provided the Petitioner this document after Wallace's direct examination but before he was cross-examined. Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply, unless the delay itself causes prejudice. The Petitioner's defense counsel was aware that Wallace was a witness to these events, that Wallace gave statements to police, and that he would be required to cross-examine Wallace. Upon receiving Wallace's specific statement to Officer Wheeler, defense counsel did not request a continuance, recall Wallace as a witness, or extensively cross-examine Wallace about this statement. Under these circumstances, we conclude that defense counsel's action, or inaction, cured any potential *Brady* violation. *See Ewing*, 1998 WL 321932, at *9.

### c. Report of Sergeant J.D. Douglas

The Petitioner contends that the State improperly failed to disclose to him the complete report of Sergeant J.D. Douglas to F.G. Warner dated November 17, 1981 ("Douglas Report"). The Douglas Report reflects that Wallace stated that "one of the suspects then stated kill all of them. Melvin Wallace stated at the time he started to run and the shooting started. Melvin Wallace stated that he was first shot in the leg and he tried to crawl to the rear and he was shot again in the side." The Petitioner asserts that the report

fails to mention Wallace witnessing either clerk being shot, and, because he did not have the report, he was denied information that the defense could have used to impeach Wallace's trial testimony.

Unlike the previous two documents, the State never disclosed this document to the Petitioner. The Petitioner had, however, two other documents in his possession in which Wallace made statements substantially similar to the statements he made in the Douglas Report. The Petitioner's trial counsel did not request a continuance, recall Wallace as a witness, or extensively cross-examine Wallace about the two similar statements that he had in his possession at the time of Wallace's cross-examination, thus Petitioner's claim that the Douglas report impacted his ability to impeach Wallace is not well taken. Further, Wallace's statement in the Douglas Report was not inconsistent with Wallace's trial testimony. The Petitioner has not proven that there is a reasonable probability that the result of the proceedings would have been different if the State had disclosed this document. There was other evidence presented at trial proving Petitioner McKay shot Cooke.

### d. Summary Report of Dawkins and Hester

The Petitioner contends the State failed to disclose to him the Officers Dawkins and Hester Summary Report in whichWallace stated "he was first shot in the leg and he tried to crawl to the rear of the store. He stated he heard several more shots." Again, as previously stated, nothing in these reports exculpates Petitioner McKay. These reports reflect Melvin Wallace's perception of what was occurring to him and does not exclude the possibility of Wallace witnessing the murder. Moreover, other evidence at trial identified the Petitioner as Cooke's shooter.

### e. Differences Between Wallace's Statements

The Petitioner next contends that there were differences between the four statements that Wallace had given to police and, had he had possession of all four statements, he could have cross-examined the Petitioner about these differences. The post-conviction court noted, "The mere allegation that different officers' reports of oral statements made by Mr. Wallace immediately after the killings use different words and phrases in describing the events of this double murder do not make them 'material exculpatory and impeaching evidence.'" The lower court found the statements to be neither favorable nor material.

We agree with the post-conviction court. After reviewing the statements, we do not agree with the Petitioner's characterization of the differences as "glaring." While Wallace used different words when he described the events, his statements were not so contradictory to each other as to make them material or exculpatory evidence. Further, the Petitioner had

17

in his possession two of the four statements about which he complains, neither of which he used to cross-examine Wallace and between which there were some minor inconsistencies. Accordingly, we conclude he is not entitled to relief on this issue.

### f. Alleged Deliberate Deception

The Petitioner additionally argues that the State's presentation of Wallace's testimony about Wallace watching Petitioner McKay shoot Cooke was a deliberate deception of the court and jurors. We cannot agree. While it is true that Wallace did not mention to the officers when he gave these statements that he saw the shooting, it is also true that the statements do not indicate that he denied seeing the shooting. We cannot conclude that, based solely upon the fact that Wallace's statements to police immediately after the shooting omit reference to the fact that he saw Petitioner McKay shoot Cooke, Wallace was untruthful in his trial testimony. Similarly, we cannot conclude there was any deception on the part of the State. The Petitioner is not entitled to relief on this issue.

### 2. Shower Caps

At trial, the State presented evidence that a week before the robbery in this case at the L&G Sundry Store, a robbery had occurred at the nearby Lillie & Eddie Grocery Store. At trial, two witnesses, Eddie Wright and Gino White, testified that the Lillie & Eddie Grocery Store robbers wore green or blue hospital scrub caps. The State also introduced evidence that, when police arrested Petitioners McKay and Sample, they found two old hospital scrub caps in the trunk of the car in which they were riding when they were arrested. The State also introduced evidence that the gun found in the Petitioners' car was positively identified as the gun used in the Lillie & Eddie Grocery Store robbery.

On appeal, the Petitioner contends that the State failed to disclose to him a Supplementary Offense Report, dated August 18, 1981, written by Sergeants Crawford and Sims, neither of whom testified at trial. The Petitioner asserts that, in the report, witnesses to the Lillie & Eddie Grocery Store robbery differed in their description of what the robbers wore on their heads. Specifically, he asserts that the witnesses in the report described the robbers as wearing blue or green "shower caps," which he says is significantly different from a "hospital scrub cap." Without this report, the Petitioner contends, he could not adequately cross-examine witnesses Wright or White about whether the robbers had worn "hospital scrub caps" or "hospital caps" as opposed to "shower caps." Further, he asserts that the State "found the difference sufficiently important to insure that all of the witnesses from the Lillie & Eddie Grocery robbery identified the robbers as wearing 'hospital scrub caps' regardless of how they had previously described them."

18

The post-conviction court rejected the Petitioner's argument that there was a significant difference between "hospital caps" and "shower caps," concluding "[t]his court sees no difference in these descriptions." "[W]hether described as hospital, shower or scrub caps, and any such description of these caps by any witness would be inculpatory, not exculpatory." The court concluded that "[t]his information is neither favorable to the petitioner nor material."

We conclude, as did the post-conviction court, that there was no material difference in the descriptions. In the report, the witnesses said that the robbers both wore the "caps" and one of them wore his under a baseball cap. The Petitioner has not proven how the information contained in the report the State failed to disclose was exculpatory information and not inculpatory. Further, we conclude there is no evidence that the State "insured" that the witnesses used specific language when describing what the robbers wore on their heads. The Petitioner is not entitled to relief on this issue.

### 3. Sammy House as Possible Suspect in Lillie & Eddie's Grocery Store Robbery

The Petitioner contends the State failed to disclose to him a document titled Supplementary Offense Report, written by Sergeant Malone and dated August 30, 1981. In this document, Officer Malone related a conversation with Eddie Wright, the owner and victim of the robbery at Lillie & Eddie's grocery store. Eddie Wright told Officer Malone that, the day after the robbery at Lillie & Eddie's, a friend identified Sammy House as a person involved in the robbery. Eddie Wright also informed the officer that "some older guys were riding bikes back and forth in front of his store before the holdup occurred." Officer Malone noted in the report that "some older male blacks were riding bikes back and forth in front of the L&G [Sundry Store]." The report also indicated that Sammy House, who was known as a "holdup man," had been seen riding a bike by L&G Sundry Store before the robbery/murders. Officer Malone did not testify at the Petitioner's trial, and this report was not provided to the defense.

The post-conviction court noted that, at trial, Eddie Wright identified both Petitioner McKay and Petitioner Sample as the two robbers inside the Lillie & Eddie Grocery Store. The post-conviction court concluded that "this information would be considered favorable to the petitioner, assuming it were in fact true, unless House were a third person in the getaway car." The court determined that this report should have been turned over to the defense "in the abundance of caution to enable them to attempt to obtain the friend's name and investigate this allegation." Notwithstanding, the post-conviction court did not find this report to be "material." The post-conviction court explained "[t]here has been no showing that a Sammy House had anything to do with the robbery of Eddie Wright's store or that any investigation would have turned up anything of value to help the petitioner at trial." The

post-conviction court held that confidence in the verdict was not undermined by this evidence considering the other evidence presented, including that: Eddie Wright identified the Petitioner as the man who had stolen his .45 during the Lillie & Eddie's grocery store robbery; Gino White identified the Petitioner as one of the Lillie & Eddie's robbers; the Petitioner was arrested within 24 hours of the L&G's Sundry Store robbery/murders in the car identified as the car used in that robbery; at the time of his arrest he possessed the .45 stolen from the Lillie & Eddie's robbery in his waistband; he had more .45 ammunition in his pocket; the .45 was positively identified as being used in the L&G robbery/murders; Petitioner McKay was identified by Wallace and Charles Rice as the man who used the .45 during the L&G robbery/murders; and the Petitioner made incriminating statements implicating himself in the L&G robbery/murders to Charles Malone.

Reviewing the evidence from the trial and the post-conviction hearing, we conclude that, while the State should have disclosed this document, it's failure to do so does not undermine our confidence in the verdict. First, the information about House as a possible suspect in the Lillie & Eddie's robbery did not negate Wright's positive identification of Petitioner McKay as one of the Lillie & Eddie's robbers. Further, there was extensive proof inculpating the Petitioner in both crimes. Finally, the Petitioner did not present any proof at the post-conviction hearing concerning the alleged involvement of House or any other alleged suspect in the offenses. Under these circumstances, we cannot conclude that he has shown that he is entitled to relief on this issue.

### 4. Grover Jones and Possible Drug Sales

The Petitioner next contends the State failed to disclose to him an August 30, 1981, document titled "Memphis Police Department Supplementary Offense Report," written by Officer Malone. In this document, Officer Malone reported that Grover Jones, victim Steve Jones's uncle, was the owner of the L&G Sundry Store. Officer Malone stated he asked one of the store's regular customers and Grover Jones's girlfriend whether they had any knowledge about "dope peddling or anything going on in the store," which he suspected because there were two boxes of "nickel bags" in the store. Both said that Grover Jones did not sell marijuana, and the officer learned that Grover Jones did not sell drugs but did sell the nickel bags. The report reflected that Officer Malone later learned that Grover Jones was the manager and not the owner of the L&G Sundry Store and that "sometime in the last year or so that they had served a warrant on the L&G Grocery . . . and had found a considerable amount of marijuana in the meat coolers, which is located in the rear of the store." In the report, Officer Malone stated that Grover Jones asserted that he was the owner of the store and explained that "he was in partners with a guy named Pete (something) who has a grocery store on Volentine and this subject was the one who was dealing in dope at the time they were partners, that he was positively not dealing in dope himself." Officer Malone opined

20

that Grover Jones was withholding information. In the report, Officer Malone explored the possibility that drugs might be involved in the robbery/murders, because two boxes of bags used to package $5.00 units of marijuana were found in the store.

The Petitioner asserts that this document indicated that "there were illegal drug sales being conducted at the L&G Grocery" and "reflects adversely upon the tenuous credibility of the state's witnesses, including Melvin Wallace and Charles Rice in that they may have motive to testify falsely if they were involved in the drug sales at the store. Further, he asserts that the trial court "missed the point" when it found that this information was not exculpatory because "[e]ven if the robbery/murders were committed to get drugs instead of cash, the killings would still be felony murder." The Petitioner asserts that not having this document prevented the defense from properly investigating the possibility that someone else "involved in the marijuana trade" had motive and opportunity to commit this crime.

The post-conviction court found the information contained in this document was not exculpatory. The post-conviction court determined that the author's "feeling" that Grover Jones was withholding information was "mere speculation." The post-conviction court determined that this information could not have been used by the Petitioner to impeach Grover Jones's credibility. As previously stated, the post-conviction court acknowledged that "[e]ven if the robbery/murders were committed to get drugs instead of cash, the killings would still be felony murders."

We conclude first that this information is not exculpatory. The Petitioner must prove that this evidence is "favorable" in order to show a *Brady* violation occurred. Again, favorable evidence is "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *See Johnson*, 38 S.W.3d at 56-57. We cannot conclude that the evidence contained in this document meets any of these criteria. The fact that drugs were found on the premises a year before the robbery/murders and that police found "nickel bags" on the premises after this crime seems of little import, especially in light of the fact that no drugs were found on the premises at the time of the murder. Further, Officer Malone's opinion that Grover Jones may be withholding information does not provide some "significant aid to the defendant's theory of the case." We also do not think this information challenges the credibility of the State's witnesses as it in no way reflects on any of the State's witnesses. Finally, this evidence is not material in that it does not call into question our confidence in the verdict given the evidence presented against the Petitioner.

### 5. Charles Rice's Statement

21

Sixteen year old Charles Rice identified both Petitioner McKay and Petitioner Sample at trial and testified that he watched Petitioner McKay shoot and kill Steve Jones. The Petitioner contends that the State improperly failed to disclose to him two documents relating to Charles Rice. First, he asserts the State failed to disclose Charles Rice's statement to police on August 31, 1981. In this statement, which was given to defense counsel after Rice testified on direct but before his cross-examination, Rice provided a physical description of the Petitioner that the Petitioner contends did not match his appearance in 1981.

Second, the Petitioner asserts the State failed to disclose a September 1, 1981, document titled "Supplementary Offense Report," written by Sergeants Robertson and Hodges. Neither sergeant testified, and this document was never provided to defense counsel. This report contains observations that Rice was nervous and being pressured by his mother to tell police what he had seen. The report also contains physical descriptions of the robbers that the Petitioner contends did not match his physical description in 1981. The report indicates Rice saw the taller of the two men shoot and kill victim Jones, and the record reflects that Petitioner Sample is substantially taller than Petitioner McKay. Further, the report indicates that Rice first told police that he did not see anything and then told police that he saw the taller, "dark-skinned black male with the scar" shoot Jones. This, the Petitioner contends, is dramatically different from his trial testimony that Petitioner McKay, the shorter of the two robbers, who is "light-skinned with no scar," shot Jones. Finally, the Petitioner contends that the report proves that it was impossible for Rice to see what he testified to at trial because, in the report he states that he was peeking through the front door during the murders, and the evidence at trial was that Steve Jones was murdered in the rear of the store. The store was described at trial as having a "dog leg" around the front counter in order to come into the main aisle of the store. The Petitioner asserts that it would have been physically impossible for Charles Rice to have observed the murder in the back of the store while peeking in the front door.

The post-conviction court determined that this information was presented to the jury at trial. At trial, the State brought out information that Charles Rice initially did not come forward to law enforcement officials. Rice's statement was turned over to the defense after Rice's testimony, and he was extensively cross-examined about this statement as well as a prior statement he gave to the defense investigator. Rice was further impeached when he admitted at trial that he lied to a defense investigator when he stated that he was not present at the scene. The post-conviction court concluded that "[t]his information was clearly already known by the defense prior to trial and was thoroughly explored in front of the jury on cross-examination."

We conclude that the Petitioner has not proven a *Brady* violation as to Rice's August 31, 1981 statement to police provided to defense counsel before cross-examination. As

22

previously stated, *Brady* generally does not apply when the State discloses information in a delayed fashion unless the delay causes prejudice. *Caughron*, 855 S.W.2d at 548. We conclude that the delay in this case did not prevent the defense counsel from effectively using this evidence, in that defense counsel extensively cross-examined Rice about his statement. Further, the defense did not request a continuance after receipt of the evidence or recall a witness to testify regarding the evidence; thereby curing any *Brady* violation. *Ewing*, 1998 WL 321932, at *9.

As to the September 1, 1981 "Supplementary Offense Report" written by Sergeants Robertson and Hodges, we conclude that the Petitioner has not proven a *Brady* violation. First, the physical descriptions provided in that report are substantially similar to the physical descriptions provided in the August 31, 1981, statement that defense counsel was provided at trial. Second, as to the issue of which robber actually shot Jones, we note that the evidence at trial proved the two men were at the store together, engaged in the robbery together, and were each criminally responsible for the actions of the other. Finally, on cross-examination by the defense, Rice confirmed that he only peeped through the door to see what was occurring inside. Defense counsel was aware of the layout of the store, and thus was aware that Rice could not see the Jones murder from where he testified he was standing. This was, therefore, not information unknown to defense counsel. As such, we conclude the Petitioner is not entitled to relief on this issue.

### 6. Willie Everett's Statement

At trial, the State presented witnesses Eddie Wright and Gino Wright, who both identified Petitioner McKay and Petitioner Sample as the robbers of the Lillie & Eddie Grocery Store, and identified Petitioner McKay as the robber who took the .45 that was later used in the L&G Sundry robbery/murders. The Petitioner contends that the State failed to disclose to them the statement of another witness to the Lillie & Eddie robbery, Willie Everett, provided to the police on August 30, 1981. Everett, the Petitioner contends, provided a description of the robbers that did not fit the Petitioner's physical description. Everett also identified Marvin Phillips's car as being at the scene of the Lillie & Eddie's robbery and identified two other vehicles as being involved in the robbery. Everett did not testify at the Petitioner's trial.

The post-conviction court noted that the descriptions provided by Everett were not the descriptions of the robbers, "but of the drivers of the two cars that Mr. Everett says made the scene. . . ." Everett claimed at least four men were involved, that three men drove up with shotguns, two went in the store, and then a second car with a shotgun-carrying driver drove up. The post-conviction court noted that Everett provided "a much more lengthy statement to the petitioner's investigator, Ralph Nally, than to the police" but that defense counsel

elected not to call Everett as a witness. The post-conviction court found "that this statement is minimally exculpatory in that the height and weight description of the men who went into the store is somewhat different from the other varying descriptions turned over to the defense . . . but it is clearly not material." The post-conviction court explained, "This witness told a very different story than the others, involving shotguns and stalled cars, from a viewpoint across the street from the robbery in the store."

We conclude the Petitioner has not proven a *Brady* violation with regard to this statement. Defense counsel Jones testified that he first received notice of the name Willie Everett from the indictment. His file contained two transcribed statements that his investigator, Investigator Nally, took from Willie Everett, one on August 19, 1982, and the other on January 7, 1982. In the August 1982 statement, Willie Everett described the robbery and mentioned that he saw two cars pull into the parking lot during the robbery: a 1965 gold, four-door Chevrolet and a 1974 maroon four-door "duce and a quarter." Everett told Nally that the individuals in the car possessed shotguns. Jones confirmed he had Everett's statement to Nally prior to trial. Even having this information, defense counsel chose not to call Everett as a witness. We conclude that the evidence contained in the statement provided by Everett to police on August 30, 1981, does not differ substantially from the information gleaned by Investigator Nally. Further, we agree with the post-conviction court that the information is not material in that our confidence in the verdict is not undermined by the State's failure to dislcose Everett's statement of August 30, 1981.

### 7. Fingerprint Report

The Petitioner contends that the State failed to disclose to him a document titled "Fingerprint Check Request, L.W. Hunt, 'Lillie's Grocery'" dated August 31, 1981. He asserts that the report indicated that none of the prints found at the scene of the Lillie & Eddie Grocery Store robbery, which occurred before the L&G robbery/murders, matched the Petitioner's fingerprints. This was true, he said, despite the testimony at trial that the Lillie & Eddie robbers repeatedly tried to open the cash register and placed their hands on the counters.

The post-conviction court rejected this claim, finding:

First, the document gives no indication of if, when or where any prints were obtained, and whether or not they were of any value for comparison purposes. Secondly, it is unclear as to whose prints any prints recovered from the scene were compared. Lastly, there was no proof at the hearing that this document had not been turned over to, shown to, or discussed with the defense attorneys prior to trial. There was no particular testimony during the trial that the

24

petitioner touched any certain object, and the failure to find his fingerprints at the scene, while finding other, unidentified prints at a grocery store open to the public, would not exculpate the petitioner.

We agree with the post-conviction court's well reasoned findings. The information contained in this document is unclear at best, and it is neither favorable to the Petitioner nor is it material. The Petitioner is not entitled to relief on this issue.

### 8. Cumulative Effect

Finally, the Petitioner contends that the cumulative effect of the State's failure to disclose evidence denied him due process. The United States Supreme Court requires that a conviction be reversed if the cumulative nature of the alleged *Brady* violations deprived the Petitioner of a fair trial. *Kyles v. Whitely*, 514 U.S. 419, 436 (1995). Considering our holdings on each of the alleged *Brady* violations, we conclude that our confidence in the verdict is not undermined and that the Petitioner has not shown that there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. He is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's dismissal of the Petitioner's petition for post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE

25